Chief Justice Rehnquist
delivered the opinion of the Court.
This suit is here for a second time. In Shaw v. Reno, 509 U. S. 630 (1993) (Shaw I), we held that plaintiffs whose complaint alleged that the deliberate segregation of voters into separate and bizarre-looking districts on the basis of race stated a claim for relief under the Equal Protection Clause of the Fourteenth Amendment. We remanded the case for further consideration by the District Court. That court held that the North Carolina redistricting plan did classify *902 voters by race, but that the classification survived strict scrutiny and therefore did not offend the Constitution. We now hold that the North Carolina plan does violate the Equal Protection Clause because the State’s reapportionment scheme is not narrowly tailored to serve a compelling state interest.
The facts are set out in detail in our prior opinion, and we shall only summarize them here. After the 1990 census, North Carolina’s congressional delegation increased from 11 to 12 members. The State General Assembly adopted a reapportionment plan, Chapter 601, that included one majority-black district, District 1, located in the northeastern region of the State. 1991 N. C. Sess. Laws, ch. 601. The legislature then submitted the plan to the Attorney General of the United States for preclearance under § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c (1988 ed.). The Assistant Attorney General for Civil Rights, acting on the Attorney General’s behalf, objected to the proposed plan because it failed “to give effect to black and Native American voting strength” in “the south-central to southeastern part of the state” and opined that the State’s reasons for not creating a second majority-minority district appeared “to be pretextual.” App. 151— 153. Duly chastened, the legislature revised its districting scheme to include a second majority-black district. 1991 N. C. Extra Sess. Laws, ch. 7. The new plan, Chapter 7, located the minority district, District 12, in the north-central or Piedmont region, not in the south-central or southeastern region identified in the Justice Department’s objection letter. The Attorney General nonetheless precleared the revised plan.
By anyone’s measure, the boundary lines of Districts 1 and 12 are unconventional. A map portrays the districts’ deviance far better than words, see the Appendix to the opinion of the Court in Shaw I, supra, but our prior opinion describes them as follows:
*903 “The first of the two majority-black districts ... is somewhat hook shaped. Centered in the northeast portion of the State, it moves southward until it tapers to a narrow band; then, with finger-like extensions, it reaches far into the southern-most part of the State near the South Carolina border. ...
“The second majority-black district, District 12, is even more unusually shaped. It is approximately 160 miles long and, for much of its length, no wider than the [Interstate]-85 corridor. It winds in snakelike fashion through tobacco country, financial centers, and manufacturing areas ‘until it gobbles in enough enclaves of black neighborhoods.’” Shaw I, supra, at 635-636 (citation omitted).
Five North Carolinians commenced the present action in the United States District Court for the Eastern District of North Carolina against various state officials.[1] Following our reversal of the District Court’s dismissal of their complaint in Shaw I, the District Court allowed a number of individuals to intervene, 11 on behalf of the plaintiffs and 22 for the defendants. After a 6-day trial, the District Court unanimously found “that the Plan’s lines were deliberately drawn to produce one or more districts of a certain racial composition.” 861 F. Supp. 408, 417,473-474 (1994). A majority of the court held that the plan was constitutional, nonetheless, because it was narrowly tailored to further the State’s compelling interests in complying with §§2 and 5 of the Voting Rights Act, 42 U. S. C. §§ 1973, 1973c. 861 F. Supp., at 474. The dissenting judge disagreed with that portion of the judgment. We noted probable jurisdiction. 515 U. S. 1172 (1995).
*904 As a preliminary matter, appellees challenge appellants’ standing to continue this lawsuit. In United States v. Hays, 515 U. S. 737 (1995), we recognized that a plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge the legislation which created that district, but that a plaintiff from outside that district lacks standing absent specific evidence that he personally has been subjected to a racial classification. Two appellants, Ruth Shaw and Melvin Shimm, live in District 12 and thus have standing to challenge that part of Chapter 7 which defines District 12. See Miller v. Johnson, 515 U. S. 900, 909 (1995). The remaining appellants do not reside in District 1, however, and they have not provided specific evidence that they personally were assigned to their voting districts on the basis of race. Therefore, we conclude that only Shaw and Shimm have standing and only with respect to District 12.[2]
We explained in Miller v. Johnson that a racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect. Id., at 904-905; see also Shaw I, 509 U. S., at 657; Adarand Constructors, Inc. v. Peña, 515 U. S. 200 (1995). This is true whether or not the reason for the racial classification is be *905 nign or the purpose remedial. Shaw I, supra, at 642-643, 653; Adarand, supra, at 228-229. Applying traditional equal protection principles in the voting-rights context is “a most delicate task,” Miller, supra, at 905, however, because a legislature may be conscious of the voters’ races without using race as a basis for assigning voters to districts. Shaw I, supra, at 645-646; Miller, 515 U. S., at 916. The constitutional wrong occurs when race becomes the “dominant and controlling” consideration. Id., at 911, 915-916.
The plaintiff bears the burden of proving the race-based motive and may do so either through “circumstantial evidence of a district’s shape and demographics” or through “more direct evidence going to legislative purpose.” Id., at 916. After a detailed account of the process that led to enactment of the challenged plan, the District Court found that the General Assembly of North Carolina “deliberately drew” District 12 so that it would have an effective voting majority of black citizens. 861 F. Supp., at 473.
Appellees urge upon us their view that this finding is not phrased in the same language that we used in our opinion in Miller v. Johnson, supra, where we said that a plaintiff must show “that race was the predominant factor motivating the legislature’s decision to place a significant number of voters within or without a particular district.” Id., at 916.
The District Court, of course, did not have the benefit of our opinion in Miller at the time it wrote its opinion. While it would have been preferable for the court to have analyzed the case in terms of the standard laid down in Miller, that was not possible. This circumstance has no consequence here because we think that the District Court’s findings, read in the light of the evidence that it had before it, comport with the Miller standard.
First, the District Court had evidence of the district’s shape and demographics. The court observed “the obvious fact” that the district’s shape is “highly irregular and geo *906 graphically non-compact by any objective standard that can be conceived.” 861 F. Supp., at 469. In fact, the serpentine district has been dubbed the least geographically compact district in the Nation. App. 332.
The District Court also had direct evidence of the legislature’s objective. The State’s submission for preclearance expressly acknowledged that Chapter 7’s “overriding purpose was to comply with the dictates of the Attorney General’s December 18,1991 letter and to create two congressional districts with effective black voting majorities.” App. 162 (emphasis added). This admission was confirmed by Gerry Cohen, the plan’s principal draftsman, who testified that creating two majority-black districts was the “principal reason” for Districts 1 and 12. Id., at 675; Tr. 514. Indeed, ap-pellees in their first appearance before the District Court “formally concede[d] that the state legislature deliberately created the two districts in a way to assure black-voter majorities,” Shaw v. Barr, 808 F. Supp. 461, 470 (EDNC 1992), and that concession again was credited by the District Court on remand, 861 F. Supp., at 473-474. See also Shaw I, supra, at 666 (White, J., dissenting) (“The State has made no mystery of its intent, which was to respond to the Attorney General’s objections by improving the minority group’s prospects of electing a candidate of its choice” (citation omitted)). Here, as in Miller, “we fail to see how the District Court could have reached any conclusion other than that race was the predominant factor in drawing [the challenged district].” Miller, supra, at 918.
In his dissent, Justice Stevens argues that strict scrutiny does not apply where a State “respects” or “complies] with traditional districting principles.” Post, at 931-932 (“[R]ace-based districting which respects traditional districting principles does not give rise to constitutional suspicion”), post, at 932 (“Miller demonstrates that although States may avoid strict scrutiny by complying with traditional districting principles ... ”). That, however, is not the *907 standard announced and applied in Miller;[3] where we held that strict scrutiny applies when race is the “predominant” consideration in drawing the district lines such that “the legislature subordinate^] traditional race-neutral districting principles ... to racial considerations.” Miller, supra, at 916. (Justice Stevens articulates the correct standard in his dissent, post, at 930, but he fails to properly apply it.) The Miller standard is quite different from the one that Justice Stevens advances, as an examination of the dissent’s reasoning demonstrates. The dissent explains that “two race-neutral, traditional districting criteria” were at work in determining the shape and placement of District 12, and from this suggests that strict scrutiny should not apply. Post, at 936-939. We do not quarrel with the dissent’s claims that, in shaping District 12, the State effectuated its interest in creating one rural and one urban district, and that partisan politicking was actively at work in the districting process. That the legislature addressed these interests does not in any way refute the fact that race was the legislature’s predominant consideration. Race was the criterion that, in the State’s view, could not be compromised; respecting communities of interest and protecting Democratic incumbents came into play only after the race-based decision had been made.
Racial classifications are antithetical to the Fourteenth Amendment, whose “central purpose” was “to eliminate racial discrimination emanating from official sources in the States.” McLaughlin v. Florida, 379 U. S. 184, 192 (1964); *908 Richmond v. J. A. Croson Co., 488 U. S. 469, 491 (1989) (opinion of O’Connor, J.) (“[T]he Framers of the Fourteenth Amendment . . . desired to place clear limits on the States’ use of race as a criterion for legislative action, and to have the federal courts enforce those limitations”). While appreciating that a racial classification causes “fundamental injury” to the “individual rights of a person,” Goodman v. Lukens Steel Co., 482 U. S. 656, 661 (1987), we have recognized that, under certain circumstances, drawing racial distinctions is permissible where a governmental body is pursuing a “compelling state interest.” A State, however, is constrained in how it may pursue that end: “[T]he means chosen to accomplish the State’s asserted purpose must be specifically and narrowly framed to accomplish that purpose.” Wygant v. Jackson Bd. of Ed., 476 U. S. 267, 280 (1986) (opinion of Powell, J.). North Carolina, therefore, must show not only that its redistricting plan was in pursuit of a compelling state interest, but also that “its districting legislation is narrowly tailored to achieve [that] compelling interest.” Miller, 515 U. S., at 920.
Appellees point to three separate compelling interests to sustain District 12: to eradicate the effects of past and present discrimination; to comply with § 5 of the Voting Rights Act; and to comply with §2 of that Act. We address each in turn.[4]
*909 A State’s interest in remedying the effects of past or present racial discrimination may in the proper case justify a government’s use of racial distinctions. Croson, 488 U. S., at 498-506. For that interest to rise to the level of a compelling state interest, it must satisfy two conditions. First, the discrimination must be “‘identified discrimination.’” Id., at 499, 500, 505, 507, 509. “While the States and their subdivisions may take remedial action when they possess evidence” of past or present discrimination, “they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief.” Id., at 504. A generalized assertion of past discrimination in a particular industry or region is not adequate because it “provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.” Id., at 498 (opinion of O’Connor, J.). Accordingly, an effort to alleviate the *910 effects of societal discrimination is not a compelling interest. Wygant, supra, at 274-275, 276, 288.[5] Second, the institution that makes the racial distinction must have had a “strong basis in evidence” to conclude that remedial action was necessary, “before it embarks on an affirmative-action program,” 476 U. S., at 277 (plurality opinion) (emphasis added).
In this suit, the District Court found that an interest in ameliorating past discrimination did not actually precipitate the use of race in the redistricting plan. While some legislators invoked the State’s history of discrimination as an argument for creating a second majority-black district, the court found that these members did not have enough voting power to have caused the creation of the second district on that basis alone. 861 F. Supp., at 471.
Appellees, to support their claim that the plan was drawn to remedy past discrimination, rely on passages from two reports prepared for this litigation by a historian and a social scientist. Brief for Appellees Gingles et al. 40-44, citing H. Watson, Race and Politics in North Carolina, 1865-1994, App. 610-624 (excerpts), and J. Kousser, After 120 Years: Redistricting and Racial Discrimination in North Carolina, id., at 602-609 (excerpts). Obviously these reports, both dated March 1994, were not before the General Assembly when it enacted Chapter 7. And there is little to suggest that the legislature considered the historical events and social-science data that the reports recount, beyond what individual members may have recalled from personal experience. We certainly cannot say on the basis of these reports that the District Court’s findings on this point were clearly erroneous.
*911 Appellees devote most of their efforts to arguing that the race-based redistricting was constitutionally justified by the State’s duty to comply with the Voting Rights Act. The District Court agreed and held that compliance with §§2 and 5 of the Act could be, and in this suit was, a compelling state interest. 861 F. Supp., at 437. In Miller, we expressly left open the question whether under the proper circumstances compliance with the Voting Rights Act, on its own, could be a compelling interest. Miller, 515 U. S., at 921 (“[w]hether or not in some cases compliance with the Voting Rights Act, standing alone, can provide a compelling interest independent of any interest in remedying past discrimination . ..”). Here once again we do not reach that question because we find that creating an additional majority-black district was not required under a correct reading of § 5 and that District 12, as drawn, is not a remedy narrowly tailored to the State’s professed interest in avoiding § 2 liability.
With respect to § 5 of the Voting Rights Act, we believe our decision in Miller forecloses the argument, adopted by the District Court, that failure to engage in the race-based districting would have violated that section. In Miller, we considered an equal protection challenge to Georgia’s Eleventh Congressional District. As appellees do here, Georgia contended that its redistricting plan was necessary to meet the Justice Department’s preclearance demands. The Justice Department had interposed an objection to a prior plan that created only two majority-minority districts. We held that the challenged congressional plan was not required by a correct reading of § 5 and therefore compliance with that law could not justify race-based districting. Id., at 921 (“ [Compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws”).
*912 We believe the same conclusion must be drawn here. North Carolina’s first plan, Chapter 601, indisputably was ameliorative, having created the first majority-black district in recent history. Thus, that plan, “ 'even if [it] fall[s] short of what might be accomplished in terms of increasing minority representation,’ ” “ ‘cannot violate § 5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution.’” Id., at 924, quoting Days, Section 5 and the Role of the Justice Department, in B. Grofman & C. Davidson, Controversies in Minority Voting 56 (1992), and Beer v. United States, 425 U. S. 130, 141 (1976).
As in Miller, the United States relies on the purpose prong of § 5 to explain the Department’s preclearance objections, alleging that North Carolina, for pretextual reasons, did not create a second majority-minority district. Brief for United States as Amicus Curiae 24. We again find the Government’s position “insupportable.” Miller, supra, at 924. The General Assembly, in its submission filed with Chapter 601, explained why it did not create a second minority district; among its goals were “to keep precincts whole, to avoid dividing counties into more than two districts, and to give black voters a fair amount of influence by creating at least one district that was majority black in voter registration and by creating a substantial number of other districts in which black voters would exercise a significant influence over the choice of congressmen.” App. 142. The submission also explained in detail the disadvantages of other proposed plans. See, e. g., id., at 139, 140, 143 (Balmer Congress 6.2 Plan’s “[s]econd ‘minority’ district did not have effective minority voting majority” because it “depended on the cohesion of black and Native American voters, and no such pattern was evident” and “this plan dramatically decreased black influence” in four other districts). A memorandum, sent to the Department of Justice on behalf of the legislators in charge of the redistrieting process, provided still further reasons for the State’s decision not to draw two minority districts as *913 urged by various interested parties. App. 94-138; 861 F. Supp., at 480-481, n. 9 (Voorhees, C. J., dissenting). We have recognized that a “State’s policy of adhering to other districting principles instead of creating as many majority-minority districts as possible does not support an inference that the plan ‘so discriminates on the basis of race or color as to violate the Constitution,’ and thus cannot provide any basis under §5 for the Justice Department’s objection.” Miller, supra, at 924 (citations omitted).
It appears that the Justice Department was pursuing in North Carolina the same policy of maximizing the number of majority-black districts that it pursued in Georgia. See Miller, supra, at 924-925, and n. The two States underwent the preclearance processes during the same time period and the objection letters they received from the Civil Rights Division were substantially alike. App. in Miller v. Johnson, O. T. 1994, No. 94-631, pp. 99-107. A North Carolina legislator recalled being told by the Assistant Attorney General that “you have twenty-two percent black people in this State, you must have as close to twenty-two percent black Congressmen, or black Congressional Districts in this State.” App. 201. See also Deposition of Senator Dennis Winner, id., at 698. We explained in Miller that this maximization policy is not properly grounded in § 5 and the Department’s authority thereunder. 515 U. S., at 925 (“In utilizing §5 to require States to create majority-minority districts wherever possible, the Department of Justice expanded its authority under the statute beyond what Congress intended and we have upheld”). We again reject the Department’s expansive interpretation of §5. Id., at 926-927. Cf. Johnson v. De Grandy, 512 U. S. 997, 1017 (1994) (“Failure to maximize cannot be the measure of § 2”).[6]
*914 With respect to §2, appellees contend, and the District Court found, that failure to enact a plan with a second majority-black district would have left the State vulnerable to a lawsuit under this section. Our precedent establishes that a plaintiff may allege a §2 violation in a single-member district if the manipulation of districting lines fragments politically cohesive minority voters among several districts or packs them into one district or a small number of districts, and thereby dilutes the voting strength of members of the minority population. Id., at 1007. To prevail on such a claim, a plaintiff must prove that the minority group “is sufficiently large and geographically compact to constitute a majority in a single-member district”; that the minority group “is politically cohesive”; and that “the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority’s preferred candidate.” Thornburg v. Gingles, 478 U. S. 30, 50-51 (1986); Growe v. Emison, 507 U. S. 25 (1993) (recognizing that the three Gingles preconditions would apply to a §2 challenge to a single-member district). A court must also consider all other relevant circumstances and must ultimately find based on the totality of those circumstances that members of a protected class “have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” 42 U. S. C. § 1973(b). See De Grandy, supra, at 1010-1012.
*915 We assume, arguendo, for the purpose of resolving this suit, that compliance with § 2 could be a compelling interest, and we likewise assume, arguendo, that the General Assembly believed a second majority-minority district was needed in order not to violate §2, and that the legislature at the time it acted had a strong basis in evidence to support that conclusion. We hold that even with the benefit of these assumptions, the North Carolina plan does not survive strict scrutiny because the remedy — the creation of District 12— is not narrowly tailored to the asserted end.
Although we have not always provided precise guidance on how closely the means (the racial classification) must serve the end (the justification or compelling interest), we have always expected that the legislative action would substantially address, if not achieve, the avowed purpose. See Miller, supra, at 922 (“[T]he judiciary retains an independent obligation ... to ensure that the State’s actions are narrowly tailored to achieve a compelling interest”); Wygant, 476 U. S., at 280 (opinion of Powell, J.) (“[T]he means chosen to accomplish the State’s asserted purpose must be specifically and narrowly framed to accomplish that purpose”) id., at 278, n. 5 (opinion of Powell, J.) (race-based state action must be remedial); Shaw I, 509 U. S., at 655 (“A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression”). Cf. Missouri v. Jenkins, 515 U. S. 70, 88 (1995) (With regard to the remedial authority of a federal court: “ ‘The remedy must... be related to “the condition alleged to offend the Constitution . . . and must be “‘remedial in nature, that is, it must be designed as nearly as possible “to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct” ’ ”) (quoting Milliken v. Bradley, 433 U. S. 267, 280-281 (1977), in turn quoting Milliken v. Bradley, 418 U. S. 717, 738, 746 (1974)). Where, as *916 here, we assume avoidance of § 2 liability to be a compelling state interest, we think that the racial classification would have to realize that goal; the legislative action must, at a minimum, remedy the anticipated violation or achieve compliance to be narrowly tailored.[7]
District 12 could not remedy any potential §2 violation. As discussed above, a plaintiff must show that the minority group is “geographically compact” to establish §2 liability. No one looking at District 12 could reasonably suggest that the district contains a “geographically compact” population of any race. See 861 F. Supp., at 469. Therefore where that district sits, “there neither has been a wrong nor can be a remedy.” Growe, supra, at 41 (footnote omitted).[8]
Appellees do not defend District 12 by arguing that the district is geographically compact, however. Rather they contend, and a majority of the District Court agreed, 861 F. Supp., at 454-455, n. 50, that once a legislature has a strong basis in evidence for concluding that a §2 violation exists in the State, it may draw a majority-minority district anywhere, even if the district is in no way coincident with *917 the compact Gingles district, as long as racially polarized voting exists where the district is ultimately drawn. Tr. of Oral Arg. 50-51, 54-56.
We find this position singularly unpersuasive. We do not see how a district so drawn would avoid §2 liability. If a §2 violation is proved for a particular area, it flows from the fact that individuals in this area “have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” 42 U. S. C. § 1973(b). The vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State. For example, if a geographically compact, cohesive minority population lives in south-central to southeastern North Carolina, as the Justice Department’s objection letter suggested, District 12 that spans the Piedmont Crescent would not address that § 2 violation. The black voters of the south-central to southeastern region would still be suffering precisely the same injury that they suffered before District 12 was drawn. District 12 would not address the professed interest of relieving the vote dilution, much less be narrowly tailored to accomplish the goal.
Arguing, as appellees do and the District Court did, that the State may draw the district anywhere derives from a misconception of the vote-dilution claim. To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members. It does not. See § 1973 (“the right of any citizen”).[9]
*918 The United States submits that District 12 does, in fact, incorporate a “substantial portio[n]” of the concentration of minority voters that would have given rise to a §2 claim. Brief for United States as Amicus Curiae 27. Specifically, the Government claims that “District 12 . . . contains the heavy concentration of African Americans in Mecklenburg County, the same urban component included in the second minority opportunity district in some of the alternative plans.” Ibid. The portion of District 12 that lies in Meck-lenburg County covers not more than 20% of the district. See Exhibit 301 of Plaintiff-Intervenors, Map A, Map 9B. We do not think that this degree of incorporation could mean that District 12 substantially addresses the §2 violation. We hold, therefore, that District 12 is not narrowly tailored to the State’s asserted interest in complying with § 2 of the Voting Rights Act.
For the foregoing reasons, the judgment of the District Court is

Reversed.

 The complaint also named the Attorney General of the United States and the Assistant Attorney General for the Civil Rights Division as defendants. The District Court granted the federal officials’ motion to dismiss, Shaw v. Barr, 808 F. Supp. 461 (EDNC 1992).

 Justice Stevens would dismiss the complaint for a lack of standing. Post, at 921-923. Here, as in other places in his dissent, Justice Stevens’ disagreement is more with the Court’s prior decisions in Shaw I, 509 U. S. 630 (1993), United States v. Hays, 515 U. S. 737 (1995), and Miller v. Johnson, 515 U. S. 900 (1995), than with this decision. Justice Stevens challenged the Court’s standing analysis and its finding of cognizable injury in both Hays, supra, at 751 (Stevens, J., concurring in judgment), and Miller, supra, at 929-931 (Stevens, J., dissenting), and both Justice White and Justice Souter advanced many of the same arguments in Shaw I. See Shaw I, 509 U. S., at 659-674 (White, J., dissenting); id., at 680-687, and n. 9 (Souter, J., dissenting). Their position has been repeatedly rejected by the Court. See id., at 644-652; Miller, supra, at 909; and Hays, supra, at 744-745.

 Justice Stevens in dissent incorrectly reads Miller as demonstrating that “although States may avoid strict scrutiny by complying with traditional districting principles, they may not do so by proffering pretextual, race-neutral explanations.” Post, at 932. Miller plainly states that although “compliance with ‘traditional districting principles such as compactness, contiguity, and respect for political subdivisions’ may well suffice to refute a claim of racial gerrymandering,” a State cannot make such a refutation where “those factors were subordinated to racial objectives.” Miller, 515 U. S., at 919 (citation omitted) (emphasis added).

 Justice Stevens in dissent discerns three reasons that he believes “may have motivated” the legislators to favor the creation of the two minority districts and that he believes together amount to a compelling state interest. Post, at 941. As we explain below, a racial classification cannot withstand strict scrutiny based upon speculation about what “may have motivated” the legislature. To be a compelling interest, the State must show that the alleged objective was the legislature’s “actual purpose” for the discriminatory classification, see Mississippi Univ. for Women v. Hogan, 458 U. S. 718, 730, and n. 16 (1982), and the legislature must have had a strong basis in evidence to support that justification before it implements the classification. See infra, at 910. Even if the proper factual basis existed, we believe that the three reasons Justice Stevens prof *909 fers, separately or combined, would not amount to a compelling interest. First, the dissent seems to acknowledge that its initial reason — the “sorry history of race relations in North Carolina,” post, at 941—did not itself drive the decision to create the minority districts, presumably for the reasons we discuss infra, at 910. The dissent contends next that an “acceptable reason for creating a second majority-minority district” was the “State’s interest in avoiding the litigation that would have been necessary to overcome the Attorney General’s objection” .under § 5. Post, at 942. If this were true, however, Miller v. Johnson would have been wrongly decided because there the Court rejected the contention that complying with the Justice Department’s preclearance objection could be a compelling interest. Miller, supra, at 921-922. It necessarily follows that avoiding the litigation required to overcome the Department’s objection could not be a compelling interest. The dissent’s final reason — “the interest in avoiding the expense and unpleasantness of [§2] litigation” “regardless of the possible outcome of [that] litigation,” post, at 943 — sweeps too broadly. We assume, arguendo, that a State may have a compelling interest in complying with the properly interpreted Voting Rights Act. Infra, at 915. But a State must also have a “strong basis in evidence,” see Shaw I, 509 U. S., at 656 (quoting Richmond v. J. A. Croson Co., 488 U. S. 469, 500 (1989)), for believing that it is violating the Act. It has no such interest in avoiding meritless lawsuits.

 For examples of this limitation in application see Wygant, 476 U. S., at 274-276 (where a plurality of the Court concluded that remedying societal discrimination and promoting role models for students was not a compelling interest); Richmond v. J. A. Croson Co., supra, at 498-506.

 The United States attempts to distinguish this suit from Miller by relying on the District Court’s finding that North Carolina conducted “its own independent reassessment” of Chapter 601 and found “the Department’s objection was legally and factually supportable.” Brief for *914 United States as Amicus Curiae 25; 861 F. Supp. 408, 474 (1994) (case below). The “reassessment” was the legislature’s determination that it may be susceptible to a §2 challenge. Id., at 464-465. Even if the General Assembly properly reached that conclusion, we doubt that a showing of discriminatory effect under § 2, alone, could support a claim of discriminatory purpose under § 5. Even if discriminatory purpose could be shown, the means of avoiding such a violation could be race neutral, and so we also doubt that the prospect of violating the purpose prong of § 5 could justify a race-based redistricting plan such as the one implemented by North Carolina.

 We do not suggest that where the governmental interest is eradicating the effects of past discrimination the race-based action necessarily would have to achieve fully its task to be narrowly tailored.

 Justice Stevens in dissent argues that it does not matter that District 12 could not possibly remedy a § 2 violation because he believes the State’s plan would avoid § 2 liability. Post, at 946-947. As support, Justice Stevens relies on our decision in Johnson v. De Grandy, 512 U. S. 997 (1994), which he reads to say that “a plaintiff cannot make out a prima facie case of vote dilution under §2 unless he can demonstrate that his proposed plan contains more majority-minority districts than the State’s.” Post, at 946 (citing De Grandy, supra, at 1008). The dissent’s reading is flawed by its omission. In De Grandy, we presumed that the minority districts drawn in the State’s plan were lawfully drawn and, indeed, we expressly stated that a vote-dilution claim under §2 “requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice.” De Grandy, supra, at 1008 (emphasis added).

 This does not mean that a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown. States retain broad discretion in drawing districts to comply with the mandate of § 2. Voinovich v. Quilter, 507 U. S. 146, 156-157 (1993); Growe v. Emison, 507 U. S. 25, 32-37 (1993).