WEST TENNESSEE CHAPTER OF ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the MEMPHIS CITY SCHOOLS, et al., Defendants.

West Tennessee Chapter of Associated Builders and Contractors, Inc., et al., Plaintiffs,

v.

City of Memphis, Defendant.

Nos. 98–2128–TUA, 99–2001–TUBRE.

United States District Court, W.D. Tennessee, Western Division.

June 9, 1999.

---

## ORDER ON THE ADMISSIBILITY OF POST–ENACTMENT EVIDENCE

TURNER, District Judge.

Plaintiff West Tennessee Chapter of Associated Builders and Contractors, Inc. ("ABC"), along with several of its individual members, brought these actions challenging the defendants' use of racial preferences in the awarding of construction contracts. During the discovery process, the parties have disagreed as to whether the defendants may now gather and use evidence that was not before them prior to enacting their affirmative action plans to justify the need for those plans. The parties have briefed the issue and the court

heard oral argument on May 21, 1999. For the following reasons, the court holds that post-enactment evidence may not be used to demonstrate a compelling interest for the defendants' racial preference programs.

## I. *Background*

In 1996, both the City of Memphis and the City's Board of Education adopted minority and women business enterprise ("MWBE") programs. These programs require non-minority prime contractors to meet certain goals with respect to using minority-owned subcontracting companies. Failure to meet these goals can result in a bid being declared unresponsive and, therefore, rejected.

Although the MWBE plans were enacted in 1996, the relevant history of these plans dates back to the United States Supreme Court's decision in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Croson*, the Supreme Court held that MWBE programs, such as those adopted by the defendants, could survive challenge under the Equal Protection Clause, but only if the governmental entity implementing the plan could show a "strong basis in evidence" for its conclusion that remedial action was necessary to combat past discrimination in a particular industry. *See Croson*, 488 U.S. at 500, 109 S.Ct. 706.

In response to the *Croson* decision, many municipalities commissioned disparity studies to determine the existence or nonexistence of discrimination within specified industries. The City of Memphis, the Board of Education, and several other governmental entities not before the court, formed a consortium and commissioned D.J. Miller and Associates to perform a disparity study of public contracting in the Memphis metropolitan area. The study concluded that consortium members had actively discriminated against MWBEs in the past and passively participated in present day discrimination against minority subcontractors. Based on this study, the defendants enacted their MWBE programs.

In these suits, plaintiffs challenge the constitutionality of the MWBE programs enacted by the City and the Board of Education. They argue that the Miller study relied on in enacting the programs is seriously statistically flawed, and therefore cannot demonstrate a strong basis in evidence of the need for the programs to remedy prior discrimination. The court has yet to fully address the merits of the Miller study. However, it has expressed concern over the statistical methodology employed in the study and has issued a preliminary injunction preventing the Board of Education from considering race as required by the MWBE program when awarding construction contracts.

As these cases progress, the defendants are attempting to gather additional evidence to supplement the Miller study. Plaintiffs adamantly deny that such new evidence may be used to demonstrate a strong basis in evidence of prior discrimination in the industry. They argue that the defendants were required to have a strong basis in evidence of such prior discrimination before implementing a race-based program and, therefore, any evidence of prior discrimination by the governmental entities themselves or by the prime contractors gathered post-enactment is simply irrelevant.

## II. *Analysis*

The analysis of this issue must begin with the Supreme Court's holding in *Croson*. In that case, the City of Richmond adopted a racially-based plan similar to the plans adopted by the defendants in these cases. The Supreme Court held that the protections of the Equal Protection Clause apply equally to all individuals, regardless of the racial group to which they belong. *Id.* at 493–94, 109 S.Ct. 706. Thus, the court was unwilling to uphold the Richmond program based simply on the city's claim that it enacted the plan to achieve remedial goals made necessary by past discrimination. *Id.* at 498–99, 109 S.Ct. 706. However, the Court acknowledged that remedial purposes could justify the

use of racial classifications provided that action was taken within the constraints of the Fourteenth Amendment. *Id.* at 492, 109 S.Ct. 706.

■■■ To satisfy the Equal Protection clause, all racial classifications, even remedial ones, must pass strict scrutiny. *Id.* at 493–98, 109 S.Ct. 706. Thus, the governmental entity must show that its racial preference program served a compelling government interest and that the program was narrowly tailored to serve that interest. The Court further held that a compelling interest could be said to exist only where there is a "strong basis in evidence" to support the city's conclusion that action was necessary to remedy prior discrimination in the relevant industry. *Id.* at 500, 109 S.Ct. 706.

■ The Court in *Croson* was not faced with the issue of post-enactment evidence, so it is not surprising that it did not specifically state whether the strong basis in evidence must be developed before a plan is enacted or whether it is sufficient that the underlying factual predicate is proven at trial to have existed, despite the lack of knowledge of that predicate by those enacting the plan. However, much of the language in the opinion suggests that the Court meant to require the governmental entity to develop the evidence before enacting a plan. The Court characterized racial classification as a "highly suspect tool," and noted that the very purpose of strict scrutiny is to "smoke out" illegitimate uses of race and ensure "that there is

little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* at 493, 109 S.Ct. 706. When evidence of remedial need is not developed until after a racial preference plan is enacted, that evidence provides no insight into the motive of the legislative or administrative body. Thus, while race-based programs may be justified to remedy past discrimination, the governmental entity seeking to implement such a plan "must identify that discrimination, public or private, with some specificity *before* they may use race-conscious relief." *Id.* at 504, 109 S.Ct. 706 (emphasis added).

The Supreme Court's holding in *Croson* was based on its decision in *Wygant v. Jackson Bd. of Ed.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). *Wygant* involved a policy of extending preferential protection against layoffs to some employees based on race. The Court held that a public employer "must ensure that, *before* it embarks on an affirmative-action program, it has convincing evidence [1] that remedial action is necessary." *Id.* at 277, 106 S.Ct. 1842 (emphasis added). The Court further noted that it is the duty of the trial court in these types of cases to "make a factual determination that the employer *had* a strong basis in evidence for its conclusion that remedial action was necessary." *Id.* (emphasis added). "Had" is past tense. The inquiry is directed at whether the employer *had* a strong basis in evidence, not whether it now *has* or can acquire such evidence.[2]

---

1. The Sixth Circuit has held that "convincing evidence" is just another name for "strong basis in evidence." *See United Black Firefighters Ass'n v. Akron,* 976 F.2d 999, 1010 (6th Cir.1992).

2. In her concurrence in *Wygant,* Justice O'Connor stated that a "contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action plan." *Id.* at 289, 106 S.Ct. 1842. Defendants argue that this language definitively shows that a strong basis in evidence can be established by post-enactment evidence. This

argument is based on a misunderstanding Justice O'Connor's meaning of contemporaneous findings.

 Defendants equate Justice O'Connor's statement that contemporaneous or antecedent findings are not required, with the proposition that no pre-enactment evidence is required. Clearly that is not the case. Justice O'Connor definitively states that the entity enacting an affirmative action plan must have a "sufficient" or "firm" basis before it to conclude remedial action is warranted. *Id.* at 291–92, 106 S.Ct. 1842. She is a member of the plurality that concludes a basis is sufficient if it amounts to a strong basis in evidence. *Id.* at 277, 106 S.Ct. 1842.

Any possible ambiguity in the holdings of *Wygant* and *Croson* was erased by *Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). In *Shaw,* Chief Justice Rehnquist, writing for the Court, discussed the holding of *Wygant* and, specifically emphasizing the word "before," stated that: "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary, *'before* it embarks on an affirmative-action program.'" *Id.* at 910, 116 S.Ct. 1894 (emphasis in original). *Shaw* further explained that to survive strict scrutiny the governmental entity's actual purpose must be remedial and it must identify the past or present discrimination it seeks to remedy "with some specificity" before implementing race conscious relief. *Id.* at 908–09 & n. 4, 116 S.Ct. 1894.

 The holdings of *Wygant, Croson* and *Shaw* collectively suggest that the court's task is not to determine if there is now a compelling interest to justify race-based remedial action; its task is to determine if the defendants, at the time they adopted race-based plans, had a compelling interest to act on the basis of race. A compelling interest is present only if at the time of implementing their raced based plans, the defendants "had a strong basis in evidence for [their] conclusion that remedial action was necessary." *Wygant,*

So if Justice O'Connor agrees that evidence is required before enacting a racial preference plan, what is meant by her statement that contemporaneous or antecedent findings are not required? A full reading of her concurrence suggests that she meant only to allow public employers to rely on evidence other than particularized conclusions that they discriminated in specific instances—the kind of findings that would arise from an employee filing a Title VII lawsuit or initiating an internal grievance procedure. Instead, to support the need for an affirmative action program, a public entity may rely on disparity shown by proper statistical analysis. *Id.* at 292, 106 S.Ct. 1842 ("[Public employers may rely on] demonstrable evidence of a disparity between the percentage of qualified blacks on a school's teaching staff and the percentage of qualified minorities in the relevant labor

476 U.S. at 277, 106 S.Ct. 1842; *Shaw,* 517 U.S. at 910, 116 S.Ct. 1894; *see also Long v. City of Saginaw,* 911 F.2d 1192, 1197 (6th Cir.1990) ("[T]he Saginaw Police Department must ensure, *before* it embarks upon an affirmative action program, that it has convincing proof of prior discrimination . . . .") (emphasis added). Thus, binding precedent counsels against allowing the use post-enactment evidence to establish a compelling interest.

Defendants argue, however, that unlike in *Shaw,* they had at least some evidence of the need for remedial action and they should therefore be allowed to develop further evidence to meet the strong basis in evidence standard. They point to several decisions of the courts of appeal allowing post-enactment evidence. In fact, every circuit that has directly addressed the question of post-enactment evidence has held that it is admissible. *See Coral Construction Co. v. King County,* 941 F.2d 910 (9th Cir.1991); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 60 (2d Cir.1992); *Contractors Ass'n of Eastern Pennsylvania v. Philadelphia,* 6 F.3d 990 (3d Cir.1993); *Concrete Works of Colorado, Inc. v. Denver,* 36 F.3d 1513 (10th Cir.1994); *Engineering Contractors Ass'n of South Florida, Inc. v. Metropolitan Dade County,* 122 F.3d 895 (11th Cir.1997); *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, —— L.Ed.2d —— (1998).[3]

pool. . . ."). Thus, Justice O'Connor's concurrence in *Wygant* merely stands for a proposition that would become the plurality position is *Croson*—inference of discrimination based on statistics can demonstrate a strong basis in evidence for the conclusion that remedial action is necessary. *Croson,* 488 U.S. at 509, 109 S.Ct. 706 ("Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged . . . an inference of discriminatory exclusion could arise.").

**3.** All of these decisions, except *Metropolitan Dade County,* were issued prior to *Shaw.* While *Metropolitan Dade County* was handed down subsequent to *Shaw,* it never mentions *Shaw* or attempts to distinguish it.

In particular, the Ninth and Tenth Circuits have specifically endorsed defendants' view that while *Croson* requires some pre-enactment evidence to justify an affirmative action program, the strong basis in evidence requirement may be met using post-enactment evidence. *See Coral Construction,* 941 F.2d at 920; *Concrete Works,* 36 F.3d at 1521.

> [W]here a state has a good faith reason to believe that systemic discrimination has occurred, and is continuing to occur, in a local industry, we will not strike down the program for inadequacy of the record if subsequent factfinding bears out the need for the program. In other words, a plan will not be invalidated solely because the record at time of enactment did not measure up to constitutional standards.

*Coral Construction,* 941 F.2d at 921.

There are several problems with this argument. First, while *Croson* never explicitly required the governmental body to develop a strong basis in evidence prior to implementing the racial preference plan, *Croson* adopted the "strong basis in evidence" test from *Wygant.* As the court noted above, the holding of *Wygant* specifically stated that the governmental entity must "ensure that, *before* it embarks on an affirmative-action program, it has convincing evidence that remedial action is necessary." *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842 (emphasis added); *see also Shaw,* 517 U.S. at 910, 116 S.Ct. 1894.

■ Second, this approach requires the court to examine whether, prior to enactment of the plan, the public entity had some evidence of discrimination sufficient to form a "good-faith belief" that remedial action was justified. It is defendants' position that even the slightest bit of evidence is sufficient provided that it resulted in a good-faith belief that remedial action was warranted. Remedial action is warranted, however, only if there is a strong basis in evidence for its need. *See Croson,* 488 U.S. at 500, 109 S.Ct. 706. Thus, if a public entity has evidence that does not reach the strong basis in evidence standard, it simply does not have sufficient evidence to form a good-faith belief that remedial action is justified.

With all due respect to these various circuit courts that have addressed this issue, the court concludes that admitting post-enactment evidence to show a compelling interest is contrary to Supreme Court precedent, as developed in *Wygant, Croson* and *Shaw.* The court holds, therefore, that post-enactment evidence may not be used to demonstrate that the government's interest in remedying prior discrimination was compelling.

■ This holding allows the court to properly strictly scrutinize the implementation of the racial preference programs. "To be a compelling interest, the State must show that the alleged objective [remedying prior discrimination] was the legislature's 'actual purpose' for the discriminatory classification ... and the legislature must have had a strong basis in evidence to support that justification before it implements the classification." *See Shaw,* 517 U.S. at 908 n. 4, 116 S.Ct. 1894. Thus, strict scrutiny is concerned not just with whether the factual predicate exists justifying the defendants' actions, but also whether the defendants' actual purpose was remedial. *See Croson,* 488 U.S. at 493, 109 S.Ct. 706 ("Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining ... what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics."); *Mississippi University for Women v. Hogan,* 458 U.S. 718, 730 & n. 16, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (holding that the state failed to establish that its alleged remedial purpose was the actual purpose underlying the discriminatory conduct); *United Black Firefighters Ass'n,* 976 F.2d at 1009 ("[A] state actor posses a compelling state interest when its concern is with remedying past discrimination."). Excluding post-enactment evidence is appropriate because that evidence provides no insight into whether the gov-

ernmental body was actually acting to remedy a problem.

■ Because motive is an issue, it also makes sense to require that the governmental entity establish a strong basis in evidence before acting, rather than allowing a lesser standard. It is normally not possible to actually examine the motives of individual legislative officials or establish the motive of the body as a whole. However, where a governmental entity establishes a strong basis in evidence of the need for remedial action prior to enacting a racially-based program, the court can fairly infer that the actual purpose of the program is remedial. On the other hand, if a governmental body implements a racial preference plan with little or no evidence of the need for such a program, the court can only speculate on the government's motive. Such speculation is insufficient to survive strict scrutiny analysis. *See Shaw,* 517 U.S. at 908 n. 4, 116 S.Ct. 1894 ("[A] racial classification cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature.").

Additionally, allowing the use of post-enactment evidence may encourage a government with strong racial political motivations to enact race-based preferences without an adequate factual basis. If sued, the government can then marshal its resources and use the subpoena power of the courts to support its program. This prospect may create a chilling-effect that discourages non-minorities from protecting their rights. A non-minority contractor, for instance, might feel that its equal protection rights have been violated by an affirmative action plan adopted without proper evidence of its need. However, the contractor may hesitate to sue, knowing that if it does, the public defendant will conduct extensive additional research through the legal process in an attempt to support the plan. In essence, the plaintiff would be forced to attack a moving target of newly developing evidence to support past motivations, rather than to deal with the motivating factors that existed at the time of the government's action.

■ The court also finds the policy arguments in support of allowing post-enactment evidence unavailing. Several courts have suggested that preventing the use of post-enactment evidence causes municipalities to face the dilemma of deciding whether to wait months for the development of the record, thereby possibly risking liability toward blacks, or act prematurely, thereby risking liability toward whites. *See Coral Construction,* 941 F.2d at 921; *Contractors Ass'n of Eastern Pennsylvania,* 6 F.3d at 1004. However, racial remedies are a highly suspect tool meant to be used only as a last resort. *See Croson* 488 U.S. at 493–94, 507, 109 S.Ct. 706. Therefore, it is completely reasonable to require a public entity to fully develop the record before implementing a program that touches upon equal protection rights by giving one racial group a preference over another. Moreover, neither defendants, nor any of the courts that have articulated this argument, have ever explained how a public entity could be found liable for delaying the implementation of a racial preference program until such time as it has a strong basis in evidence to conclude that remedial action is warranted.

The court also rejects the position of some courts that post-enactment evidence is especially proper when dealing primarily with injunctive relief. *See Contractors Ass'n of Eastern Pennsylvania,* 6 F.3d at 1004; *Concrete Works,* 36 F.3d at 1521. Although the rationale for this position has not been expressly articulated, it appears to rest on the assumption that if the post-enactment evidence proves disparity, the defendants will simply reenact the MBWE program if it is struck down for failure to develop a strong basis in evidence before enacting the plan. Such an assumption is unwarranted and is not one that the court should engage in. The membership of legislative and administrative bodies changes over time and with those changes, the

political feasibility of enacting such a program changes. similarly, elected officials are responsive to public opinion. Thus, even if the membership of the body does not change, individual members may be less likely (or more likely) to enact such a program. In short, the court cannot, and need not, predict how other instruments of government will react to its ruling. The prudent course is to make a decision based on existing law and leave the executive and legislative bodies to react as they deem appropriate. In this case, existing Supreme Court precedent establishes that the compelling need for an affirmative action program must be established before it is implemented. *See Shaw,* 517 U.S. at 910, 116 S.Ct. 1894; *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842.

### III. *Conclusion*

For the foregoing reasons, the court holds that post-enactment evidence may not be used to demonstrate a compelling need for defendants' MWBE plans.