IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 17, 2011

Lyle W. Cayce
Clerk

No. 09-50822

ABIGAIL NOEL FISHER; RACHEL MULTER MICHALEWICZ,

Plaintiffs – Appellants

v.

UNIVERSITY OF TEXAS AT AUSTIN; DAVID B. PRYOR, Executive Vice Chancellor for Academic Affairs in His Official Capacity; BARRY D. BURGDORF, Vice Chancellor and General Counsel in His Official Capacity; WILLIAM POWERS, JR., President of the University of Texas at Austin in His Official Capacity; BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM; R. STEVEN HICKS, as Member of the Board of Regents in His Official Capacity; WILLIAM EUGENE POWELL, as Member of the Board of Regents in His Official Capacity; JAMES R. HUFFINES, as Member of the Board of Regents in His Official Capacity; JANIECE LONGORIA, as Member of the Board of Regents in Her Official Capacity; COLLEEN MCHUGH, as Chair of the Board of Regents in Her Official Capacity; ROBERT L. STILLWELL, as Member of the Board of Regents in His Official Capacity; JAMES D. DANNENBAUM, as Member of the Board of Regents in His Official Capacity; PAUL FOSTER, as Member of the Board of Regents in His Official Capacity; PRINTICE L. GARY, as Member of the Board of Regents in His Official Capacity; KEDRA ISHOP, Vice Provost and Director of Undergraduate Admissions in Her Official Capacity; FRANCISCO G. CIGARROA, M.D., Interim Chancellor of the University of Texas System in His Official Capacity,

Defendants – Appellees

Appeal from the United States District Court
for the Western District of Texas

No. 09-50822

## ON PETITION FOR REHEARING EN BANC

(Opinion 1/18/11, 5 Cir., 631 F.3d 213)

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

PER CURIAM:

The court having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service and not disqualified not having voted in favor (FED. R. APP. P. and 5TH CIR. R. 35), the Petition for Rehearing En Banc is DENIED.

Voting for en banc rehearing were: Chief Judge Edith H. Jones, Judge E. Grady Jolly, Judge Jerry E. Smith, Judge Edith B. Clement, Judge Priscilla R. Owen, Judge Jennifer Walker Elrod, and Judge Catharina Haynes.

Voting against en banc rehearing were: Judge Carolyn Dineen King, Judge W. Eugene Davis, Judge Emilio M. Garza, Judge Fortunato P. Benavides, Judge Carl E. Stewart, Judge James L. Dennis, Judge Edward C. Prado, Judge Leslie H. Southwick, and Judge James E. Graves.[*]

Upon the filing of this order, the clerk shall issue the mandate forthwith. See FED. R. APP. P. 41(b).

ENTERED FOR THE COURT:

_Patrick E. Higginbotham_
_____
Patrick E. Higginbotham
United States Circuit Judge

---

[*] In 2009, the court decided to begin identifying the judges voting for or against en banc rehearing where a poll is taken and the request for en banc rehearing is denied.

2

EDITH H. JONES, Chief Judge, with whom E. GRADY JOLLY, JERRY E. SMITH, EDITH B. CLEMENT and PRISCILLA R. OWEN, Circuit Judges, join, dissenting:

By a narrow margin, this court has voted not to rehear this case en banc. I respectfully dissent. This panel decision essentially abdicates judicial review of a race-conscious admissions program for undergraduate University of Texas students that favors two groups, African-Americans and Hispanics, in one of the most ethnically diverse states in the United States. The panel purports to apply the Supreme Court's decision in Grutter v. Bollinger,[1] which authorized some race conscious admissions to Michigan Law School to foster educational "diversity." The panel's opinion, however, extends Grutter in three ways. First, it adopts a new "serious good faith consideration" standard of review, watering down Grutter's reliance on strict narrow tailoring. Second, it authorizes the University's race-conscious admissions program although a race-neutral state law (the Top Ten Percent Law) had already fostered increased campus racial diversity. Finally, the panel appears to countenance an unachievable and unrealistic goal of racial diversity at the classroom level to support the University's race-conscious policy. This decision in effect gives a green light to all public higher education institutions in this circuit, and perhaps beyond, to administer racially conscious admissions programs without following the narrow tailoring that Grutter requires.

Texas today is increasingly diverse in ways that transcend the crude White/Black/Hispanic calculus that is the measure of the University's race conscious admissions program. The state's Hispanic population is predominately Mexican-American, including not only families whose Texas roots stretch back for generations but also recent immigrants. Many other Texas Hispanics are from Central America, Latin America and Cuba. To call these groups a

---

[1] 539 U.S. 306, 123 S. Ct. 2325 (2003).

"community" is a misnomer; all will acknowledge that social and cultural differences among them are significant. Whether the University also misleadingly aggregates Indians, Pakistanis and Middle Easterners with East "Asians" is unclear, but Houston alone is home to hundreds of thousands of people from East Asia, South Asia and the Middle East. In Texas's major cities, dozens of other immigrant groups reside whose families have overcome oppression and intolerance of many kinds and whose children are often immensely talented. Privileging the admission of certain minorities in this true melting-pot environment seems inapt. But University administrators cherish the power to dispense admissions as they see fit, which might be reasonable except for two things: the Texas legislature has already spoken to diversity, and the U.S. Constitution abhors racial preferences. Because even University administrators can lose sight of the constitutional forest for the academic trees, it is the duty of the courts to scrutinize closely their "benign" use of race in admissions.

1.     That Fisher deviates from Grutter's legal analysis is evident from a brief comparison of the cases. In Grutter, the Court approved the Michigan Law School's holistic, individual consideration of applications that included a student's race as a factor in addition to many other non-academic factors when the school pursued the "compelling interest" of having a "diverse" student body. The result of the policy was consequential, a tripling of the number of African-American and Hispanic law students, from 4% to 14.5% of the student body. Grutter, 539 U.S. at 320, 123 S. Ct. at 2334. Unlike the Fisher panel, however, the Supreme Court mentioned deference to university administrators' decisions at only two points in its opinion. Grutter expressly followed the narrow tailoring inquiry used in other cases assessing race-conscious governmental policies.

First, recognizing the unique constitutional interests of the academy, the Court "presume[d]" the good faith of the university within its discussion leading to the "conclusion that the Law School has a compelling interest in a diverse

4

student body . . . ." Grutter, 539 U.S. at 328-29, 123 S. Ct. at 2338-39. But even for this purpose, the Court awarded only "a degree of deference" to administrators' academic decisions. Id. at 2339.

Second, the Court stated that narrow tailoring "require[s] serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." 539 U.S. at 339, 123 S. Ct. at 2345. This discussion of university decisionmaking was meant to challenge the university, not to bless whatever rationale it advances for racially preferential admissions. Grutter emphasized, by repeated references to prior decisions concerning racial preferences, that the government "is still 'constrained in how it may pursue [a compelling interest]: [T]he means chosen to accomplish the . . . asserted purpose must be specifically and narrowly framed to accomplish that purpose.' " 539 U.S. at 333, 123 S. Ct. at 2341 (citing Shaw v. Hunt, 517 U.S. 899, 908, 116 S. Ct. 1894 (1996), a redistricting decision). Further, it held, narrow tailoring "must be calibrated to fit the distinct issues raised" by promoting racial diversity in higher education. Grutter, 539 U.S. at 334, 123 S. Ct. 2341. Far from diluting narrow tailoring in order to defer to university administrators, the Grutter Court cited Adarand[2]—an employment case—to demonstrate consistency with prior equal protection jurisprudence. The Court explained in detail how the racial "plus factor" in Grutter still required minority applicants to compete with nonminority applicants; why this program was not an impermissible quota system; how nonminority candidates with lower academic scores were often admitted over minority candidates; why race-neutral alternative admission programs would not serve the university's particular interests; why nonminority students were not "unduly burdened" by the racial factor in the admissions process; and finally, why an end point or periodic review of the process was necessary to comply with the Constitution.

---

[2]Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S. Ct. 2097 (1995).

Certainly, Grutter authorizes university officials, in certain circumstances, to pursue campus "diversity" using race as one factor in their decisionmaking. But on its face, Grutter does not countenance "deference" to the university throughout the constitutional analysis, nor does it divorce the Court from the many holdings that have applied conventional strict scrutiny analysis to all racial classifications.

The Fisher panel opinion, although occasionally difficult to understand, supplants strict scrutiny with total deference to University administrators.[3] First, the opinion's Standard of Review section mentions strict scrutiny in the first sentence, but goes on for several paragraphs counseling deference to universities. The panel, contrary to the Supreme Court's requirement that every race-conscious governmental decision bears a heavy burden of proof, issues this blanket approval:

> Grutter teaches that so long as a university considers race in a holistic and individualized manner, and not as part of a quota or fixed-point system, courts must afford a measure of deference to the university's good faith determination that certain race-conscious measures are necessary to achieve the educational benefits of diversity, including attaining critical mass in minority enrollment.

Fisher, 631 F.3d 213, 233 (5th Cir. 2011). This statement apparently conflates the University's compelling interest with narrow tailoring, or at least it misleads as to the importance of each prong of strict scrutiny analysis.

Second, immediately following this summary, the panel seeks support from the Parents Involved case, which followed Grutter and reiterated the Supreme Court's disapproval of "benign" race-based student assignment decisions in public schools. Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 127 S. Ct. 2738 (2007). But Fisher misquotes Parents Involved in saying that "[Parents Involved] invoked Grutter's 'serious, good faith

---

[3]I do not disagree with the panel's conclusion that following Grutter, we may presume a university's good faith in the decision that it has a compelling interest in achieving racial and other student diversity. But that is as about as far as deference should go.

consideration' standard, <u>rather</u> <u>than</u> the strong-basis-in-evidence standard that Appellants would have us apply [to the narrow tailoring inquiry]." Fisher, 631 F.3d at 234 (emphasis added). There is no support in Parents Involved for this artificial dichotomy, nor for Fisher's later assertion that Parents Involved might have turned out differently — i.e., racially discriminatory assignments might have been allowed — had there been no "other, more narrowly tailored means" to serve the school districts' purposes. Id. On the contrary, Parents Involved juxtaposed the narrow tailoring inquiries of Grutter and City of Richmond v. J.A. Croson Co., 488 U.S. 469, 519, 109 S. Ct. 706 (1989)(Kennedy, J., concurring), an employment decision. Parents Involved, 551 U.S. at 735, 127 S. Ct. at 2760. This parallelism illustrated that Grutter's "serious, good faith consideration" statement is not a new standard at all, but rather a way to express the classic requirement that narrow tailoring be more than a rote exercise in dismissing race-neutral alternatives.[4] With due respect to the panel, Fisher fails to apply the avowed continuity in principle of the Court's decisions. The panel's "serious, good faith consideration" standard distorts narrow tailoring into a rote exercise in judicial deference.

Third, the panel disturbingly implies that only procedural, not substantive, consideration of a university's race-conscious admissions program is necessary. Fisher, 631 F.3d at 231 ("Rather than second-guess the merits of the University's decision, . . . we instead scrutinize the University's decisionmaking process . . . ."). Grutter nowhere countenances this radical dilution of the narrow tailoring standard.

---

[4]The Fisher panel is simply wrong in attempting to divorce Grutter's standards from those of employment discrimination cases. Fisher, 631 F.3d at 233 (holding that employment cases "have little purchase in this challenge to university admissions."). Both Grutter and Parents Involved routinely invoke those cases.

Finally, the panel reinforces its overbroad approval or, more precisely, judicial abdication, in its Conclusion, which mentions a "serious, good faith consideration" standard twice and opines that the University's plan "is more a process than a fixed structure that we review." Id. at 246-47.

2.      The effect of the panel's wholesale deference becomes clear when one considers the important factual distinction between this case and Grutter. In Fisher, the plaintiffs challenged a post-Grutter University plan whereby 19% of the entering freshman class were subject to a race-conscious admissions process to increase diversity.[5] As Judge Garza's concurrence demonstrates, the number of students actually admitted under this racial preference policy is unclear, but it amounted to no more than a couple hundred out of more than six thousand new students. 631 F.3d at 260-61 (Garza, J., specially concurring).

The panel opinion asserts that the University's admission process is constitutionally acceptable because it is modeled closely after Grutter. Yet the difference is obvious. The Texas legislature statutorily mandated increased diversity in admissions by means of the Top Ten Percent Law. Under that race-neutral law, covering 80% of University admissions, the top ten percent of graduates from every Texas high school were automatically admitted, and many African-American and Hispanic students matriculated to the University. The challenged preferential policy was adopted on top of the unprecedentedly high numbers (compared to many other universities) of preferred minorities entering under the Top Ten Percent Law.[6]

---

[5] I follow Judge Garza's convention of using figures for enrolled Texas students for the same reasons identified in his concurrence. See 631 F.3d at 260 n.19. If we were to expand consideration to out-of-state students, then 23.8% of enrollees would not have gained admission through the Top Ten Percent Law.

[6] In dicta, the author of Fisher questions the efficacy, indeed the constitutionality of the Top Ten Percent Law, but no such issue was before the panel.

The pertinent question is thus whether a race-conscious admissions policy adopted in this context is narrowly tailored to achieve the University's goal of increasing "diversity" on the campus. Contrary to the panel's exercise of deference, the Supreme Court holds that racial classifications are especially arbitrary when used to achieve only minimal impact on enrollment. Parents Involved, 551 U.S. at 734-35, 127 S. Ct. at 2760. As the Parents Involved Court explained, "In Grutter, the consideration of race was viewed as indispensable in more than tripling minority representation at the [Michigan] law school–from 4 to 14.5 percent." Id. Despite the Fisher panel's artful use of statistics to describe the effect of the University of Texas's race-conscious plan, the contrast with Grutter is stark. As noted by the panel, more than 20% of the entering freshmen are already African-American and Hispanic, resulting in real diversity even absent a Grutter plan. The additional diversity contribution of the University's race-conscious admissions program is tiny, and far from "indispensable." It is one thing for the panel to accept "diversity" and achieving a "critical mass" of preferred minority students as acceptable University goals. It is quite another to approve gratuitous racial preferences when a race-neutral policy has resulted in over one-fifth of University entrants being African-American or Hispanic.

3. Finally, in an entirely novel embroidering on Grutter, the panel repeatedly implies that an interest in "diversity" at the classroom level—in a university that offers thousands of courses in multiple undergraduate schools and majors—justifies enhanced race-conscious admissions. Fisher, 631 F.3d at 225 (citing studies that motivated the University's race-conscious plan based on classroom-level diversity); 237 (discussing the state's interest in classroom-level diversity as a constitutional matter); see also 240, 241, 243, 244, 245. Although the opinion may not expressly render a "holding" on the permissibility of

9

fostering diversity at the classroom level, it conveys a clear message. The message is reinforced in Judge Garza's concurrence, which rejects the panel majority's implication that "a university's asserted interest in racial diversity could justify race-conscious policies . . . not merely in the student body generally, but major-by-major and classroom-by-classroom.") 631 F.3d at 253-54. (Garza, J., specially concurring).

The pernicious impact of aspiring to or measuring "diversity" at the classroom level seems obvious upon reflection. Will the University accept this "goal" as carte blanche to add minorities until a "critical mass" chooses nuclear physics as a major? Will classroom diversity "suffer" in areas like applied math, kinesiology, chemistry, Farsi, or hundreds of other subjects if, by chance, few or no students of a certain race are enrolled? The panel opinion opens the door to effective quotas in undergraduate majors in which certain minority students are perceived to be "underrepresented." It offers no stopping point for racial preferences despite the logical absurdity of touting "diversity" as relevant to every subject taught at the University of Texas. In another extension of Grutter, the panel opinion's approval of classroom "diversity" offers no ground for serious judicial review of a terminus of the racial preference policy. Cf. Grutter, 539 U.S. at 343, 123 S. Ct. at 2347 ("We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today.")

In the end, this case may determine the admissions policies of institutions of higher learning throughout the Fifth Circuit, or beyond, for many years. Reasonable minds may indeed differ on the extent of deference owed to universities in the wake of Grutter, but the panel's effective abandonment of judicial strict scrutiny in favor of "deference" at every step of strict scrutiny review contradicts Grutter and Parents Involved. The panel approves race conscious admissions whose utility is highly dubious in comparison with the

effect of the Top Ten Percent Law. And the opinion's hints supporting "classroom diversity" are without legal foundation, misguided and pernicious to the goal of eventually ending racially conscious programs. I respectfully dissent from the denial of en banc rehearing.